1611631 United States v. Petras v. Shachar There are two independent reasons why this Court should reverse Mr. Petras' conviction. First, the prosecution treated the two potential jurors who were African American differently than it treated white jurors who gave identical responses to juror questioning. Is that a fair issue to raise where there were only two black members of the venire? Absolutely, Your Honor, it is. 100% of them were excluded, and we've shown just based on statistics alone you would not expect randomly selected legitimate reasons to strike both of them in a jury panel of this size with only six strikes. The second reason this Court should reverse is because the district court utilized a definition of intimidation that has been unequivocally overruled and rejected by the United States Supreme Court. And this definition permitted conviction, for instance, if the jury believed that Mr. Petras called one of the attendants a racist or a racist pig and that the flight attendant felt fear in response. I thought our Court had already upheld that particular instruction on intimidation. And the Court did in the United States v. Hicks, Your Honor, in 1992. But subsequently the Supreme Court, which is the superior court, has said what the government is allowed to criminalize in the form of intimidations. In other words, Virginia v. Black speaks unequivocally to the limits on a legislature's power to prohibit intimidation. And that was based on constitutional limits and was specifically dealing with a criminal statute where the actus reus is an act of intimidation. So on the Batson point, Your Honors, under this Court's decision in Reed v. Quarterman, a court reviewing a third-prong ruling, the pretext ruling, must conduct a, quote, careful comparison of the testimony of the stricken black jurors with that of the non-black jurors who were similarly situated. Did Reed grant the writ or did it remand? I know that Mr. Reed, it was remanded, and I know that he's no longer under a sentence of death. So I do not remember the specific remedy that Reed granted, Your Honor. But the ruling is that on the third prong, the Court needs to conduct a careful analysis. How often does the public defender attack Judge Fitzwater on Batson grounds or any of our federal district judges? It's been a long, long time since I've seen that challenge. Well, Your Honor, we are attacking the prosecution's strike here more than the judge's strike. I will say that Judge Fitzwater's— Yeah, but the third prong of Batson is that the judge looked at all the circumstances and made a fact-finding, did he not, that it was not race-motivated. So that— Your Honor, I'll say that— Well, Your Honor, Judge Fitzwater did not say, I find the prosecution's explanation credible as a factual finding, which, as Judge Fitzwater said, taking the Court at his word, was the comparators that you have chosen do not have both of the qualities in conjunction, in other words. So we've shown you, first of all, that's wrong as a matter of law, and we've shown you, secondly, that if you look at jurors 20 and 33, in fact, those jurors did have both of the qualities, and the prosecution neither struck them nor even subjected them to further questioning, which under Reed is evidence that these reasons are themselves pretextual. So if you compare the responses of juror 20 and 33, and you see that the government was willing to accept them but not willing to accept juror number 28, we think there's no other conclusion but that these reasons given were pretextual. Moving on to the second point, Your Honors, on the definition of intimidation. The Supreme Court has said what intimidation means, and this Court must follow that ruling. There are several reasons why that's the case. First of all, because Congress is required to give defendants fair notice of where the line is between permitted and prohibited conduct. Secondly, the principle of consistent usage. In other words, there are lots of statutes throughout the Federal Code where Congress has used the word intimidation in close proximity to assault, as it is under this statute, and this Court very recently has said intimidation means at least an implicit threat of the use of physical force. The problem in this case is, using the broader definition, it permits conviction for fear that the flight attendants felt based on things that the defendants didn't even know about. And that distinguishes this case from Hicks as well, and I think that's also responsive to your question, Judge Smith. In Hicks, the outcome might very well be the same as the definition of the Supreme Court under Virginia v. Black, because in Hicks, the defendant was advised that his conduct could bring the plane down and could crash it, and he said, I'm going to continue doing it. You can't stop me. In other words, that's effectively at least an implicit threat. I'm going to continue to engage in conduct that puts this aircraft at risk. Whereas in this case, the jury, there is nothing in the jury instructions themselves that says the jury didn't find that the flight attendant was intimidated by the use of the word racist or the more colorful epithet racist pig. Well, let me – well, I don't think racist is the only thing they hang their hat on as far as intimidation goes. But the statute says an individual on an aircraft who, by assaulting or intimidating a flight attendant, interferes with the performance of the duties, lessens the ability, blah, blah. Assaulting or intimidating, aren't you writing intimidating out of the statute to include assaulting? Not at all, Your Honor, because intimidating has a definition, as it does in all these other federal statutes. Well, you're saying placing in what? You're saying – The intimidation has to be something that is perceived by an objective observer as a threat or an expression of intent to engage in violence. Well, isn't that precisely what one of the stewardesses testified to? Your Honor, there was testimony as – One fellow was 6'4", 200 – well over 200 pounds, and he's trying to strain – get out of his seatbelt. Your Honor, there was testimony to that effect. The problem here is that the jury was not required to believe that testimony. Not only that, there was contradictory testimony from the two passengers who were sitting in the row immediately in front of Mr. Petras, who observed the thing in their entirety, and they said no such thing happened. In fact, both of these passengers confronted the flight attendants, and said if you would just leave these young men alone, you wouldn't have a problem. In other words, the point where the third flight attendant comes back and says, well, another passenger has tattled on you. I know that you called my colleague a racist pig, and that's unacceptable. These passengers said these young men were defending themselves. They were upset and angry about this. They felt they were being treated unfairly, but they said there was nothing intimidating about what they did. There was nothing that was frightening about it. In other words, if the— You're sitting in a seat in front of other people, and it's very hard to see what's going on behind. Unless it's a kid kicking you in the back of the seat, or unless you go out of your way to turn around and put yourself in the melee, it's very hard to interpret what's going on, don't you think? Your Honor, Mr. Garland testified that he did, in fact, turn around. He was watching it because he heard what was going on. He thought they were being treated unfairly, and you can see in a still that was provided, I think it's Defense Exhibit 7-1, which is from the body cam, you can see that Mr. Garland is tall enough, you can actually see his eyes peeking above the seat. In other words, he's completely able to observe and hear what's going on, and he says there wasn't threatening about this at all. But, Judge Jones, if the jury had been properly instructed, given the Supreme Court's definition of intimidation, and there were competing narratives, basically, and the jury believed theirs instead of ours, that would be too bad for my client. But the jury wasn't properly instructed. In other words, the instructions over our strenuous objection permitted the jury to convict on the basis of any number of theories, whether it's based on constitutionally protected conduct or conduct that would be beyond the reach of the statute as Congress intended. In other words, this Court should follow the explicit holding of the Supreme Court, both as to the actus reus of intimidation and as to the mental state of an intent to intimidate. The district court didn't do that. And I think the district court understood this, because you can see in the charge conference where he says, I just want to be sure that this is the definition the government wants. In other words, you're about to make this bed. We're going to go forward on this definition that's different, that's broader than what the Supreme Court has said, and the government said absolutely. They did not want this to be a specific intent crime with an intent to intimidate, and they did not want the jury to be asked to find that the defendant's words or conduct conveyed an intent to engage in violence. So, Your Honor, whether it is under the Batson point, because at least jurors number 20 and 33, if not several other jurors who testified similarly about flight experience. In other words, the record shows that those reasons were protectable or under the definition of intimidation itself, as the Supreme Court has held that it means something narrower than the definition this court adopted several years prior. If there's no further questions at this time, I've reserved time for rebuttal. Thank you. All right. Ms. Oscarson. Good morning, Your Honors. May it please the Court. I'm Blair Oscarson here on behalf of Appellant Wassam Shocker, and the principal issue I will address here today is that there is insufficient evidence to find beyond a reasonable doubt that Mr. Shocker, by intimidation, interfered with the performance of the flight crew's duties. No reasonable jury could have found that Mr. Shocker's intimidation interfered with duties related to safety. As Mr. Wright has pointed out, it is our view that Hicks has been overruled with regard to the definition of intimidation, but this court's instruction with regard to interference with duty and the purpose of this statute is still good law. Hicks says the purpose of this statute is to assure the utmost in airline safety so that even the most mundane duties that implicate safety cannot be taken for granted. In Hicks, those defendants were convicted of playing a radio that literally interfered with the navigation equipment on the plane. Clearly, that implicated the pilot's duty to safely fly the plane. Well, I'm sorry, but the statute itself only talks about interfering with the performance of the duties of the member or attendant or lessens the ability of crew member or attendant to perform those duties. So it doesn't say that it's only safety. That's true, Your Honor, as to the text of the statute, but this court said in Hicks that the purpose of the statute is to protect airplane safety. In this case, the defendants are accused of interfering with the duty to provide drinks and snacks. Clearly, that didn't... There was more than that, though. On this record, Mr. Shocker was accused that the duty that the government has alleged he interfered with was the inability of the flight attendants to provide drinks and snacks. Well, we'll have to look at the closing arguments because the government cites testimony beyond that. But is he the one who's 6'4"? No, Your Honor, he's about my height, a smaller man. Okay. The government's brief says also that Mr. Shocker interfered with the duties to take care of the passengers and monitor the cabin, but the evidence they cite from the record again goes to service and attention with regards to the flight attendant's duty to provide refreshments. Even if this court finds that this statute is designed to assure drinks and snacks on airplanes, it was not Mr. Shocker's intimidation of the flight attendants that prevented them from serving drinks and snacks. It was the flight attendants' continual engagement with this group, their continual return to the group to prove that they were not racist. After the comment, racist pig was made. Well, didn't a lot go forth, transpire before that? Wasn't the racist pig comment more or less at the end of their interactions? I mean, that was sort of the crowning blow. No, Your Honor. The first flight attendant denied drink service to the group. Mr. Petras pressed his call button to ask. Another flight attendant came and asked, why are you calling? He said, because they won't serve me drinks. I think they're racist. I think Southwest is racist. I think you're a racist pig. So then she left, and then another flight attendant approached and wanted to know why did you call the other flight attendant a racist pig. Are any of these flight attendants not, I mean, are they white? I mean, did racism mean anything in particular in this context? These defendants are of Iraqi descent, Mr. Shocker. Well, I understand that. What about the flight attendants? The flight attendants were white. So for a Middle Eastern to call a white person racist is, you know, both being, what do you call it, not Semitic, but, you know, Indo-European doesn't make much sense, but anyway. This group felt that they were not being served drinks because they were being treated in a racist manner. And when they complained about it, these flight attendants continued to come back over and over and over three or four times to prove that they were not racist and to argue about racism. That is the reason they could not get on with serving drinks and going about their business, because they were arguing with the group, not it was anything that Mr. Shocker did to intimidate them.  Yes, Your Honor. And they made a decision as to how it happened. They did, Your Honor. But there is no evidence in the record that Mr. Shocker interfered with any duties related to safety. No evidence that his conduct prevented these flight attendants from doing their jobs. Was he the one sitting in the middle of the seat or at the aisle? He was sitting in the middle. Your Honor, we ask that you reverse this judgment and render a verdict of acquittal for Mr. Shocker. Thank you. May it please the Court. Leah Simonton for the government. I want to start by addressing what the appellant's claim is and is not in the record. I'll tell you what's in the record. On pages 775 to 77, the first flight attendant to approach the men, who was named Victoria Clark, said both Shocker and Petras lunged at her when she refused to give their friend an alcoholic drink. It's hard to lunge when you've got your seatbelt buckled. They lunged as much as they could with their seatbelt, yes, Your Honor. Didn't this break a start before the plane took off? It did. I want to point out that in a lot of the cases where this statute has been charged, there is an escalating behavior on the part of the defendants. It'll start with things like not obeying safety instructions during boarding or rude behavior, but it escalates. It escalates to a point where there's almost always yelling, obscenity, and coupled that with aggressive physical conduct, and that is what happened. You're right, Judge Jones, that the racism and the racist pig statements that were made, those were the crowning blow. Those were not the core of the government's case. They're part of what happened, and they did contribute to the intimidation, but the intimidation was at core aggressive physical conduct coupled with loud obscenity and other things that was directed towards all three of the flight attendants. Now, when Clark was being lunged out by these men, she testified that she was afraid and she thought she was going to get hurt. That's at record 780. She put her handheld drink device down in the seat in front of her, the empty seat that was vacated by one of the witnesses who testified for the defense, so that she could have both hands free to defend herself. That's on page 779. Then she started scanning the plane to find help. She looked around to see if there were able-bodied passengers that would be able to assist her in the event they attacked her. She testified that that was the scariest point on the flight for her, was the point where both Shocker and Petras attempted to lunge at her. That's on page 794. There is similar testimony by the other two flight attendants that day that that happened when they approached the men and tried to basically get a commitment from the men that they would calm down and stop acting this way so that everyone could continue on the flight. The men acted the opposite and were incredibly physically aggressive. And if you look at the government's complaint, the original filing of the government in this case, it mentions, it emphasizes the lunging. We are not talking about, this is not a free speech case. This is a case about aggressive physical conduct, and the defendants at trial and now the appellants on appeal are running from their conduct. They are making this into a case that it really is not. Now, in terms of, I want to address, because we're on the subject of the defendants' conduct, obviously there was a lot of intimidation that was happening. There was also interference. It is not true, and it does not correctly reflect the record to say, that the only duty that these defendants interfered with was drink and snack service. That just ignores the record. Clark said, I was not able to take care of the other passengers on the aircraft. Page 794. Attendant Bergren, she's the last one to have approached these men, actually told Clark to stay up front for her own safety. She actually put one of the three flight attendants out of commission. Bergren was the lead attendant. She put Clark out of commission because she was so afraid of Clark being around these men. So you had three flight attendants in the cabin instead of, I mean, two instead of the normal three. That's on page 1133. Then Flight Attendant Roush also said, we weren't able to give anyone on the aircraft any attention other than them. What if someone had had a medical emergency? What if the flight had broken out on a plane of two passengers who were unrelated to the people at issue? These women were tasked as being the only people to keep order on this plane, to take care of the passengers on this plane. We know that after 9-11 the pilots can't leave the cockpit for any reason. There were three women who had to take care of 117 people, 40,000 feet in the air that day. One of them was put out of commission. The others were afraid of these men, and they were not functioning normally. When you say these men, were you talking about these two or the fact that there were six altogether, six in two rows, right? There were. But the government picked on these two as having the most virulent conduct? They did. In terms of the allegations that the jury didn't understand what the government's theory was and whether the flight attendants were afraid for their physical safety or could have been afraid of anything else, it's clear because the way the jury is discerning, it acquitted two of the four defendants, obviously. And those were the two that had the less aggressive physical conduct. They had more of the words. One of those defendants who was acquitted was the one who gave the scary gestures and threats to the passenger, Tiffany Dirge, who was sitting across the aisle from his row, but that they didn't directly threaten or physically act physically aggressive towards the flight attendants in the same way that Petras and Shocker did. And clearly the jury understood that that was what it was tasked with deciding, and it found those two who were most at fault guilty. Why did this trial take eight days? Well, the evidence, I think, took only about five days. I think there were some deliberations, and there might have been a weekend in there, Your Honor. I'm not exactly sure. But there was a lot of testimony by all three of the flight attendants, and there actually were more witnesses called by the defense than normally is, and most of them were not helpful to the defense, but they called a lot of the officers who came to respond after the flight had landed in an attempt to suggest that the reason that the airplane was diverted was not very serious conduct because they were trying to get the police officers to say what they had heard had happened on the plane, whereas we had almost everyone who had been on the plane testify. What about the two? I mean, did the government put on passengers, or it was just the defense who put on passengers? No, we put on the only passengers who could see what was happening, and that was Tiffany Dirge, that was Caitlin of Sullivan, and that was another Caitlin, Rose was her last name, and she was flying with Tiffany Dirge. And those women all testified to what they saw and the aggressive physical behavior that they saw the defendants, the two at issue here, exhibiting towards the flight attendants. Now, the only two passengers to testify for the defense were the two that were sitting in front, and at least one of them testified that she admitted on cross-examination, that was the female passenger, that you couldn't really see what was going on as well if you're sitting in front of someone as behind. It's possible they might have heard some of the words that were being exchanged between the flight attendants and the men, but they would not have seen, and they didn't testify to seeing, the physical conduct that the men engaged in with these flight attendants, whereas all three of the passengers who were able to see testified to that conduct and that it was scary and intimidating. They mentioned the lunging. They mentioned getting up in the flight attendant's faces, things like that. What do you, what's your, why would the Virginia v. Black not raise some doubts about our Hicks instruction? Virginia versus Black. I assume the district judge ruled on that, right? He did. Yes. He rejected the idea. Well, let's go back to what Judge FitzRodder was thinking at the time. He had a case directly on point that dealt with the definition of intimidation that this court had blessed in Hicks, and then you have another definition that's never been used in a case under this statute and, in fact, has really only been cabined to other cases that have involved symbolic speech and things of that nature, like cross-burning. And so he looked at the definitions that were at issue, and he said, I really have to go with the Hicks definition because that's the one that applies to the statute, and that's exactly what is at issue here. I have some distinctions based on, well, actually, I want to point out, too, that two other circuit courts since Virginia versus Black was released have continued to apply the definition in Hicks, and that's Persing from the Fourth Circuit and Nagani from the Ninth Circuit, and I cite both of those cases in my brief. So that statutory definition continues to be the only definition of intimidation that's applied in this context. So Virginia versus Black was a pure speech case. It also, you know, I don't think there's any real problem here with having a different definition of intimidation when it comes to what intimidation might constitute if you're talking purely about what the First Amendment would protect all the time everywhere, and that's all that Virginia versus Black was saying. What we're dealing with here is a statutory definition. It's the definition that makes the most sense in the context of the particular means of travel that's at issue in the statute, which is air travel when you're up in the sky, a very fragile environment, and it's also dealing with a different type of intimidation than was at issue in Virginia versus Black. That was symbolic speech. What is intimidation? Well, Virginia Black, I mean, you know, I might agree with you logically speaking, but does Virginia be Black talk in terms of this is limited to symbolic speech? No, it's just the context in which the statement was made, Your Honor. But I do think that it's clear from the case that it was not addressing a type of intimidation like what Hicks described, which was a combination of verbal or expressive activity and non-expressive physical conduct. In fact, what Hicks said was this statute is not simply associated with a type of speech, but it includes non-speech conduct as well. In fact, it encompasses only a relatively narrow range of speech, which will frequently be a concomitant of intimidating conduct. That's Hicks at 972. So we have a different sort of type of activity, and of course we know it's different from the fact that it's paired with assault in the statute. So it's something that is related to assault, and assault is, of course, a physical thing. I'll also point out assault is a specific intent crime, and that's one reason why Judge Fitzwater found that intimidation should be a specific intent offense also in the context of this statute. But even if you were to say that Virginia v. Black defines intimidation for purposes of what is always protected by the First Amendment, Hicks found that even under strict scrutiny, some types of speech that are ordinarily protected can be regulated under either the content-neutral time, place, manner restriction, or I guess here you could construe, just for purposes of argument, what happened here is a content-based restriction, and Hicks also found that under strict scrutiny, this statute would survive a content-based restriction. So it applied the narrow tailoring and the compelling government interest test, and it found specifically that no matter whether the type of intimidation at issue is protected by the First Amendment, it is allowed to be regulated under this statute. So I want to just quickly move to the Batson issue, because there are certain comments made by the appellants that are just not true. One was that some of the jurors gave identical answers. The jurors at issue, the ones to which they now point, did not give identical answers to the ones who were struck by the prosecution. Starting with juror number 26, that was the female who had never flown before. She was the only person in the main jury pool who had never flown before. No other person had ever flown before in that jury pool. And obviously of paramount interest to the government was whether people had flown before, whether they understood what the terminology was when you're talking about what occurs during a commercial flight. What is the safety instruction on a flight? What's an overhead bin? What do the seatbelts look like? How close are you to the flight attendant when she's taking your drink order? How close are you to the people who are across the row from you or the people in front of you? And if you have someone who's never traveled in that context, they're not going to understand what happened. They're also not going to understand what appropriate conduct would be or intimidating conduct might be in the context of an airplane. The only other person who could have conceivably ever been in any jury pool was the last alternate in the alternate pool, and that was juror number 43. The government chose to strike the first alternate in the alternate pool for another reason. The reason itself is not in the record, but I mentioned my brief. It was because she was unemployed, but the important thing about that is the government wanted to use its strike on an alternate who would be most likely to get on the jury if that was necessary and number 43 was the least likely of any alternate to get on the jury. Judge Fitzwater did find, unlike what appellants argue, did find in a credibility determination that the government was telling the truth about the strike. That is what you have to do in the third prong of Batson, the third stage of Batson. The district judge is tasked with deciding, is the government's explanation credible, and that is what he did. He found no, and I quote, purposeful discrimination on the part of the government. How often are Batson challenges raised in federal district court? Exceedingly rarely, Your Honor. That's what I thought. Yes. This is the first time I've argued Batson, actually, and I've been with the office for 12 years, and the first time I know that it could be wrong, but I've never heard of one against Judge Fitzwater. So the second juror at issue was juror number 28, and he was the man who had only flown once before. He is the only person in the record to be identified as having only flown once before. That immediately raised the government's alarm about him, and then what also raised alarm was his, I would say, extreme, unusually extreme views towards immigrants, Muslims of the wall, different things like that. He was the only person to answer a series of four questions that the defense asked the jurors in a way that suggested that he did not like Muslims, for example, and in particular Muslims. He answered one specific question in a way. Your defendants aren't Muslims. They're persecuted Christians. Exactly. So, no, no, I know. And at first you think, how does this connect? Well, the reason it connects is because of the history of what happened with the government in this case. The government was very alarmed at the idea that the defense would use the sympathetic background of the defendants as persecuted Christians who fled Islamic extremists in the Middle East. So they did not want people who were prejudiced against Muslims to be on the jury because they thought it could mean that they would give undue sympathy towards these people who had to leave their homeland and come to the United States and had some very bad things happen to family members and other people they knew while they were in Iraq. Now, the government, as I point out in my brief, filed a motion in limine on this basis before Vordaer, it was a few days before Vordaer, asking that the defense not be allowed to go into those facts at trial, and it was denied. And so just a couple of days after it was denied, is when Vordaer occurred, so the government was set on picking out who's going to be the least likely to harbor undue sympathy towards the defendants because of their background. So the first person they looked at was this Catholic nun. She was Caucasian, and she stated point blank she didn't think she could be fair. She would give the defendants too much sympathy because of their background. So the government moved to strike her for cause. So then we get to juror number 28. His answers are not quite so unequivocal, but they are along the same lines as the nun's answers in terms of suggesting that he would be sympathetic towards the defendants in the government's mind. And so what happened was the defense wanted to question him specifically to try and rehabilitate him because the defense seemed to want him on the jury. So the defense tries to, I would say, skew him even more in favor of them in the way they ask the questions. When they took him on individual questioning, the defense asked, well, we understand your feelings. The man said, I believe I can, basically discrimination against Muslims is okay because I don't like the way they act. And in essence, that's what he was saying. And so the defense said, well, but these defendants are Christian. Would you be okay with that? And he said, oh, yeah, of course. And they're like, you know, they came here from Iraq for religious reasons. The obvious inference being they were persecuted by Muslims in Iraq and that's why they came to the United States. Well, if the fellow had only flown once in his life, he may not have known much about persecuted Christians in the Middle East. That is possible, Your Honor, but obviously there's not a lot of time that the government has when it's making these decisions. And as long as it doesn't make them on a prejudiced basis, then they're acceptable. And, of course, case upon case has held that. And so the government made the only determination it could make or the safest determination it can make about him at the time, which was it didn't believe that he was the safest juror for them in terms of his possible ideology in response to the defendant's background. And the defendants went into detail about their background, starting an opening statement. Defendant Yohanna, one of the ones who ended up being convicted, his attorney was the only person to give an opening at the beginning of trial, and he went into detail about all the terrible things that Muslim extremists did to his family in Iraq that led to him coming over. Then two defendants testified in their own defense, including Mr. Shocker, and they both testified to all the bad things that happened to them because of Muslim extremists in Iraq. So what the government feared came to pass, and so they made a very reasonable and logical determination, not based at all on race, when they decided to strike number 28. And obviously that coupled with the fact that he had only flown once before, he was a prime juror for them to strike. Now, the only person who the defense has really pointed to, well, there were two, number 20 and number 33, they say are similar, but they were not similar. Number 20 had, for example, never said he'd only flown once before. But number 33, even if you think he was similar, he was farther back on the list. He was number 33. This was number 28. If you have no further questions, I will yield. Thank you. All right. Thank you. Okay, Mr. Wright. Thank you, Judge Jones. If this were a case that we knew, in other words, if the government was willing to try this case on the basis of words plus conduct, then we should have gotten supplemental jury instruction number 7, which we requested. You'll find that on page 370 of the record that says, basically a First Amendment instruction. This is protected. Don't convict them on the basis of words alone unless it's a true threat. But the government did not support that because, though there was some disputed testimony about physical conduct, the government also had lots of testimony about other kinds of fears. In other words, let me ask you a question about Virginia v. Black here because even Justice Scalia says, I agree with the court that under our decision in R.A.V.V. St. Paul, a state may, without infringing the First Amendment, prohibit cross-burning carried out with the intent to intimidate. So don't you think that Judge Fitzwater's charging this as a specific intent crime took care of it under Virginia? I don't, Your Honor, and I disagree. I believe that Judge Fitzwater probably intended to do that, but he did refuse all of our requests to sort of eliminate the ambiguity. In other words, we asked several times in that charge conference, would you please say an intent to intimidate? They had that purpose. The government fought against this. Now I hear the government admitting that this is a specific intent statute. Several times below, they argue, no, no, no, it's a general intent statute. That's why they objected to anything that was general intent. And if you look at the way the government exploited the ambiguity in its closing argument, it argued general intent. If the actions were intentional, non-accidental, then you find them guilty. In other words, that's the government's argument because the government argued this as a general intent case. If we had gotten that jury instruction and lost, then I agree. We would be out of luck. Our system commits those choices to a fairly selected and properly instructed jury. This jury was not fairly selected, and it was not properly instructed. We requested that instruction, and the district court denied it, in other words. Am I misremembering, but even if a court errs in a jury instruction, can't the error be cured if it's harmless? And can't it be deemed harmless if the parties had no problem arguing their views of the law? Your Honor, we were not able to argue no intent to intimidate, in other words, because this was presented as a general intent case and argued. We also were not allowed to argue or not effectively argue. I thought you said he charged it as a specific intent crime. I did not say that. The government said that. He believed it was, but his charge says they intentionally intimidated a flight crew member, but he refused to give the clarifying instruction. What that means is you have to have an intent to intimidate. The difference being this classic thing you learn about in first-year law school, right? This is a general intent. You intentionally acted, and it had the effect of making them afraid. And if you look, there's a lot of testimony about that, right? Based on my training, I learned that people create a distraction so that someone else could storm the cockpit. In other words, even the pilot is saying all the other soccer players, they can't get back on the plane either, because I'm afraid not that it was something that our client threatened to do or suggested he was going to do, but he was doing something that seemed a little out of the ordinary, and so they're frightened someone else is going to do it. So in other words, that's the real difference here between the Virginia versus black definition and the definition the district court used. Well, I'm sorry, but I mean the second and third sentence of Justice O'Connor's opinion says that I'm sorry, says that if they, with intent to intimidate. Now, you know, they were trying to get their alcoholic beverages, weren't they? Your Honor, it sort of disputed what was going on. They said, well, we were just joking about it, but they felt like because of the language they were speaking, that this is why they acted this way, and that made them unhappy. He says we conclude that while a state, that a state may ban cross-burning carried out with the intent to intimidate. And that instruction we weren't given. We asked for it, and we were denied it. And that's what we're here complaining about on the mental state, also on the definition of what intimidation is itself, an expression of an intent to commit a violence. In other words, the jury very well might have convicted these defendants on the basis of they did something that made the flight attendants afraid, but was not a threat or an implied threat or a suggestion that they were going to do the thing they were afraid of. In other words, the difference being the defendant does one thing, and the flight attendant feels afraid, versus the defendant is doing something that communicates I'm going to do this thing. In other words, the flight attendants never testified Mr. Petras threatened or acted like he was going to storm the cockpit. They said he acted in this weird way. We were afraid it was a diversion or a distraction. Okay. Well, thank you. We'll look at the record very closely. Thank you, Your Honor. Ms. Oscarson, you're court appointed, and we thank you for your service to the court. Appreciate it.